**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

In re:                                    )
                                          )
QUINTO & WILKS, P.C.,                     )    Case No. 14-13937-BFK
                                          )    Chapter 7
            Debtor.                       )

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

On October 22, 2014, Jenine E. Graves filed an Involuntary Petition under Chapter 7 of

the Bankruptcy Code against her former employer, Quinto & Wilks, P.C. ("Quinto & Wilks").

The Involuntary Petition was filed by Ms. Graves as a single creditor petition. Quinto & Wilks

agrees that at the time of the petition it had fewer than twelve creditors, excluding employees and

insiders. *See* 11 U.S.C. § 303(b)(2). At the time of the petition, Ms. Graves and Quinto & Wilks

were engaged in highly acrimonious (and, as often happens, increasingly expensive) litigation in

the Circuit Court of Prince William County.

Quinto & Wilks filed a Motion to Dismiss the Involuntary Petition, and an Amended

Motion to Dismiss. Docket Nos. 5, 12. Ms. Graves filed an Opposition, to which Quinto & Wilks

filed a Reply. Docket Nos. 9, 16 (Amended Response), 21 (Reply Memorandum). She also filed

a Motion for Entry of an Order for Relief. Docket No. 19. Quinto & Wilks filed an Opposition.

Docket No. 23. The Court heard the evidence and the arguments of the parties on February 5 and

27, 2015. For the reasons that follow, the Court will dismiss the Involuntary Petition.

**Findings of Fact**

The Court, having heard the evidence, makes the following findings of fact:

1.       Quinto & Wilks is a Virginia professional corporation. It is a law firm, formed in

March 1996. The two shareholders were Mr. Quinto, who was a real estate attorney and is now

retired from the practice of law (effective June 2008), and Mr. Wilks, whose practice involves

estate planning, estate administration and business matters, and who is still practicing law,

though with another firm as more fully discussed below.

2.      Mr. Wilks is currently the sole owner, president and sole director of the firm.

3.      Quinto & Wilks' offices are located at 3441 Commission Court, Woodbridge,

Virginia, 22192. Quinto & Wilks has a Lease for this space with 3441 Old Bridge, LLC

(hereinafter, "Old Bridge"), a limited liability company in which Mr. Wilks is a 50% member

and is the managing member. The Lease Agreement calls for the payment of $4,000 per month in

rent, plus a 3% annual rent escalator beginning at the end of the first lease year. Pet. Cr. Ex. 26.[1]

Mr. Wilks testified, however, that Old Bridge never requested the 3% escalator, and has never

sought to enforce the rent escalator provision of the Lease.

4.      Quinto & Wilks has subleased a portion of its space to KV Acquisition, LLC. The

Sublease Agreement is dated as of March 28, 2014. Under this Sublease, KV Acquisitions

initially was required to pay $1,500 per month in rent, plus the reimbursement of certain

expenses. Pet. Cr. Ex. 28; Q&W Ex. 35. That amount was later increased to $1,675 per month.

5.      Mr. Wilks testified that, although Quinto & Wilks is not generating any new

business, it is not presently winding up its affairs. Rather, it needs to conclude its work for the

estates where Mr. Wilks has been appointed as administrator before it can wind up its affairs.

*A. Ms. Graves' Employment With Quinto & Wilks.*

6.      Ms. Graves is an attorney. Her practice primarily involves litigation. She was

hired by Quinto & Wilks in June 2003, to handle any litigation that might arise out of the

---

[1] The Exhibits submitted by Quinto & Wilks will be referred to as the "Q&W" Exhibits. Ms. Graves' Exhibits will
be referred to as "Pet. Cr." Exhibits, for "Petitioning Creditor."

administration of decedents' estates where Mr. Wilks was acting as the administrator of the

estate.

7.      On or about March 5, 2007, Ms. Graves entered into an Employment Agreement

with Quinto & Wilks. Q&W Ex. 1.

8.      The interpretation of Section 2 (Compensation) of this Agreement is at the heart

of the parties' dispute. Section 2 provides as follows:

> **2. COMPENSATION.** As compensation for the services provided by Ms. Graves under this Agreement, Quinto & Wilks will pay Ms. Graves Forty Five percent (45%) of receipts of client billings that Ms. Graves has generated on or after September 1, 2005 and mileage and other costs charged to clients. These amounts shall be paid within 15 days of receipt of payment by Quinto & Wilks and subject to this sentence, will be paid in accordance with Quinto & Wilks' customary payroll procedures. Client deposits and retainers that have been received by Quinto & Wilks shall be applied to client billings at the time the client invoice is approved in its final form by Ms. Graves. Ms. Graves shall not be entitled to any percentage of receipts of client billings relating to services performed by Ms. Graves prior to September 1, 2005.

Q&W Ex. 1 at Sec. 2.

9.      Section 3 of the Agreement, relating to expense reimbursements, provides as

follows:

> **3. EXPENSE REIMBURSEMENT.** Quinto & Wilks will reimburse Ms. Graves for "out-of-pocket" expenses incurred by Ms. Graves that are reimbursed by the client or as otherwise agreed to between Quinto & Wilks and Ms. Graves.

*Id.* at Sec. 3.

10.     The Agreement also contains an attorney's fee provision. Section 12 states as

follows:

> **12.  ATTORNEY'S FEES.** The parties agree that each shall be responsible for their own attorneys' fees related to the preparation and execution of this Agreement. In the event that either party breaches this Agreement, the non-breaching party shall be entitled to reasonable attorney's fees and costs relating to an action to enforce the terms of the Agreement, upon the condition that he or she is successful in enforcing the Agreement.

3

*Id.* at Sec. 12.

      *B. Ms. Graves' Termination and Mr. Wilks' Move to the Vanderpool Firm.*

11.     In early 2013, Mr. Wilks decided to move his practice to the law firm of

Vanderpool, Frostick & Nishanian ("VFN"). The effective date of the transition was April 1,

2013.

12.     Ms. Graves was not offered a position with the VFN law firm. She was terminated

as an employee of Quinto & Wilks as of March 31, 2013.

13.     VFN did not take an assignment of Quinto & Wilks' Lease with Old Bridge.

Rather, VFN entered into a Lease Agreement directly with Old Bridge. Pet. Cr. Ex. 27. The

VFN-Old Bridge Lease Agreement expressly provides that: (a) Quinto & Wilks is relieved of

any obligation to pay rent under its Lease with Old Bridge; (b) Quinto & Wilks will not owe any

rent to VFN for use of the leased premises to wind down its affairs; and (c) Quinto & Wilks is

entitled to retain the rents it receives for the space from its subtenant, KV Acquisitions. *Id.* at

Sec. 2.

14.     Mr. Wilks testified that the business agreement reached with VFN provided that:

(a) Quinto & Wilks paid VFN a total of $42,510.50, consisting of two checks in the amounts of

$26,320.82 and $16,189.68 (Pet. Cr. Ex. 23); (b) Quinto & Wilks would be entitled to retain the

KV Acquisitions sublease rent for so long as Quinto & Wilks was winding down its affairs; (c)

Quinto & Wilks would retain its accounts receivable; and (d) Quinto & Wilks would cover the

rent and other expenses for the Woodbridge office for the first 45 days of operations, post-April

1, 2013, but VFN would be responsible for the rent and other expenses from March 1, 2013,

going forward. *See* Pet. Cr. Ex. 24 (VFN letter to David Wilks: "You will retain your existing

accounts receivable. You will use cash flow from those accounts receivable to cover all salaries

and overhead incurred by the Lake Ridge office during the first 45 days after the transition which we currently anticipate will be April 1.")

15.    Mr. Wilks also testified that the firm's personal property—furniture and artwork—was treated for tax purposes as a distribution to Mr. Wilks, who then contributed it to VFN in exchange for his stock in VFN.

*C. The Prince William County Lawsuit.*

16.    Subsequent to her termination from Quinto & Wilks, Ms. Graves "deduced" (her word) that clients were paying the firm, but that the firm was not remitting any payments to her in accordance with the terms of her Employment Agreement. In July 2013, Ms. Graves filed a Complaint in the Circuit Court of Prince William County against Quinto & Wilks. Q&W Ex. 3.

17.    The heart of the dispute is how Ms. Graves' compensation is to be calculated under the Agreement. Ms. Graves claims that she is entitled to 45% of *all* firm billings for matters on which she worked, including 45% of time billed by other attorneys and paralegals. The firm disagrees; it asserts that Ms. Graves is entitled to 45% of the amounts charged to clients solely for her own billable time. The firm asserts that this reading of the Agreement is consistent with the manner in which Ms. Graves historically was paid over the years. Ms. Graves argues in response that, if that is how she was paid over the course of her employment (she says she really does not know), then the firm shortchanged her and should have paid her 45% of all attorney and paralegal collections on any file on which she worked.

18.    There is a similar disagreement about how much Ms. Graves is entitled to under Section 3 of the Agreement, having to do with her expense reimbursements.

19.    The parties also disagree on whether, at this point, if Ms. Graves is paid anything, she should be paid as a W-2 employee of the firm, or as a 1099 independent contractor, now that her employment with the firm has been terminated.

20.    At about the time that she left the firm, Anna Reese, a paralegal with Quinto & Wilks, provided Ms. Graves with a handwritten calculation of amounts that she, Ms. Reese, believed were owed to Ms. Graves, based on the billings the Law Estate. Pet. Cr. Ex. 37. This calculation showed $24,601.50 as being owed to Ms. Graves. *Id.*

21.    Ms. Graves understood that the firm had been paid $34,978.15 on the Law Estate file. Pet. Cr. Ex. 40. She asserts that this is more than the amount represented to her in the Spreadsheet for the Law Estate of $24,601.50. Q&W Ex. 2. Mr. Wilks, on the other hand, testified that the $34,978.15 included his services as administrator of the estate, which were not subject to the 45% payment arrangement with Ms. Graves.

22.    Ms. Graves also asserted that the Quinto & Wilks "Transaction Detail by Account" (Pet. Cr. Ex. 7) was not accurate. She compared the amount stated on the Transaction Detail for the Pere matter ($17,001.71) with a check to the firm dated May 28, 2013, in the amount of $23,279.67. Pet. Cr. Ex. 6.

23.    Quinto & Wilks is represented in the lawsuit by Robert J. Zelnick of the firm of Zelnick & Erickson, P.C.

24.    Quinto & Wilks filed a Demurrer to Ms. Graves' Complaint, which was overruled by the Circuit Court. Pet. Cr. Ex. 41.

25.    The firm then filed an Answer to the Complaint. In its Answer, Quinto & Wilks requested an award of attorney's fees and costs. Q&W Ex. 8 at 5–6.

26.     Quinto & Wilks also filed a Counterclaim against Ms. Graves. Ms. Graves filed a Demurrer, which was sustained with leave to amend. Pet. Cr. Ex. 44. The firm ultimately non-suited the Counterclaim. Pet. Cr. Ex. 46.

27.     Quinto & Wilks filed a Motion for Summary Judgment, which was denied by the Circuit Court. Pet. Cr. Ex. 45.

28.     The parties engaged in various discovery battles, with varying degrees of success. In February 2014, the Circuit Court granted Ms. Graves' Motion to Compel the production of a list of client files for the period January 1, 2009, through March 31, 2013. Q&W Ex. 24. The Court also ordered that Quinto & Wilks furnish Ms. Graves with documents that were responsive to her document requests and "that are not stored offsite from defendant's office for which it would incur a cost of retrieval and that are not available in electronically saved format." *Id.* at ¶ 2. Quinto & Wilks filed its own Motion to Compel, which was denied on March 5, 2014. Pet. Cr. Ex. 43.

29.     In March and April 2014, Ms. Graves moved for the entry of a Restraining Order, or alternatively, for the appointment of a Receiver for the law firm, on the ground that the firm was receiving client funds and was not remitting any payments to Ms. Graves. Q&W Exs. 18, 19. The Circuit Court denied this Motion on June 20, 2014. Q&W Ex. 20.

30.     Ms. Graves' husband represented her in the lawsuit. However, Quinto & Wilks filed a Motion to Disqualify Mr. Graves on the ground that he was a potential fact witness (apparently, he had some role in preparing, or at least reviewing, the Spreadsheet that is Q&W Ex. 2). The Circuit Court agreed. At a hearing on September 30, 2014, the Court ordered that Mr. Graves was disqualified as Ms. Graves' counsel in the lawsuit. Q&W Ex. 14 at 32.

31.     Also at the September 30, 2014, hearing, the Circuit Court ordered the appointment of a Commissioner in Chancery. After some back and forth about who should serve as Commissioner, the parties agreed on John Whittington, Esq., to serve as Commissioner. *Id.* 100.

32.     Mr. Zelnick prepared a proposed Order of Reference to the Commissioner in Chancery and mailed it to Ms. Graves (who was now acting *pro se*) on October 6, 2014. Q&W Ex. 15. Mr. Zelnick followed up with a letter dated October 15, 2014 ("[p]lease advise me no later than this Friday, October 17, 2014, whether you will endorse the Decree of Reference"). Q&W Ex. 16. After hearing no response from Ms. Graves, Mr. Zelnick noticed the entry of the Order of Reference for November 13, 2014. Q&W Ex. 17.

33.     Ms. Graves testified that she disagreed with the terms of Mr. Zelnick's proposed Order of Reference. The Order of Reference provides that the Commissioner shall "report to this Court his findings and recommendation *as to whether the Court should order an accounting as prayed for by the plaintiff*." Q&W Ex. 15 (Proposed Order of Reference) (emphasis added). Ms. Graves' view was that the Circuit Court had already ordered an accounting, and that the Commissioner should conduct the accounting and report to the Circuit Court on the results of the accounting, not "whether the Court should order an accounting," as the proposed Order of Reference provided. She further testified that she did not respond to Mr. Zelnick's inquiry concerning the Order of Reference simply because she was certain that any disagreement over its terms would land the parties back in court in any event.

34.     The Order of Reference was never entered because Ms. Graves filed the Involuntary Petition against Quinto & Wilks on October 22, 2014, thereby resulting in a stay of

the litigation in the Circuit Court. As of the date of the Involuntary Petition, no trial date has been set in the Prince William litigation.

### D. The Tender of Payments to Ms. Graves.

35.     On December 30, 2013, Quinto & Wilks tendered checks in the following amounts to Ms. Graves: (a) $5,602.50 for the Silvas Construction file; (b) $21,039.67 for the Simmons file; and (c) $447.75 for the Schertler/Didlake file. Pet. Cr. Ex. 31; Q&W Ex. 4.

36.     Ms. Graves rejected the tender of these checks because they were sent to her "in full payment and satisfaction of all compensation owed to [her] by Quinto & Wilks, P.C." for two of the particular matters identified—Silvas Construction and Simmons. *Id.*[2] In Ms. Graves' view, she would be giving up the right to maintain that she was entitled to additional amounts on these files, had she cashed the checks.

37.     Quinto & Wilks admitted during the course of the litigation that it owed all of these amounts to Ms. Graves. Pet. Cr. Ex. 3 (Admitted Facts), 4 (Second Request for Admissions; Responses).[3]

### E. The Involuntary Petition.

38.     Ms. Graves filed the Involuntary Petition against Quinto & Wilks on October 22, 2014. Docket No. 1.

39.     At the time of the filing, Quinto & Wilks had $12,199.71 in its bank account with Burke & Herbert Bank. Pet. Cr. Ex. 53. The next day, however, the firm deposited a check for

---

[2] For the third matter, Schertler/Didlake, Mr. Wilks testified that the amount tendered ($447.75) was not tendered in full and final satisfaction because there were still amounts to be collected on this account.

[3] In addition to the Prince William County lawsuit, there was what might be described as satellite litigation, involving two separate estates. Ms. Graves has submitted claims against the Simmons Estates and the Law Estate for $36,959.36 and $32,748.07, respectively. Q&W Exs. 7. These disputed claims, according to Mr. Wilks, have prevented him from closing out the estates.

$43,032.85, and subsequently has made two additional small deposits, so that by the end of the month (October 2014), the account had a balance in the amount of $52,690.66. *Id.*

40.    The firm's operating account had a balance of $89,271.44 as of February 2, 2014. Pet. Cr. Ex. 30 at 13. It had a balance of $15,662.90 as of September 30, 2014. *Id.* at 1. The balance increased to $52,690.66, as of November 2, 2014 (post-Involuntary Petition). Pet. Cr. Ex. 53.[4]

41.    At the time of the involuntary petition filing, Quinto & Wilks had the following assets:

(i)    *Accounts Receivable.* Mr. Wilks testified that, as of the petition date, the firm had approximately $80,000 in accounts receivable (of which roughly $70,000 is owed by one client, the Law Estate). This testimony was unrebutted.

(ii)    *Cash.* The firm had $52,690.66 in its operating account by the end of the month in which the Involuntary Petition was filed (October 2014). Pet. Cr. Ex. 53.

(iii)    *The KV Sublease.* As of the filing, the firm had a Sublease with KV Acquisition, LLC, under which KV is currently paying the Debtor $1,675 per month plus certain office expenses. Pet. Cr. Ex. 28; Q&W Ex. 35. Under the terms of the Old Bridge – VFN Lease, Quinto & Wilks is entitled to retain this sublease income through the winding up of its affairs.

(iv)    *The $10,000 Promissory Note.* The firm has a $10,000 Promissory Note from a client, but its collectability is not certain.

---

[4] The fact that the firm's operating account had only $15,662.90 as of September 30, 2014, meant in Ms. Graves' view that the firm "spent" the $27,089.92 tendered to her in December 2013. Ms. Graves, however, did not have a lien on these funds.

42.     Also at the time of the involuntary petition filing, Quinto & Wilks had the

following <u>liabilities</u>:

(i)     *The Lease with Old Bridge.* Quinto & Wilks had a Lease Agreement with Old

Bridge. This Lease called for the payment of $4,000 per month, plus annual

escalators of 3%, beginning at the end of the first lease year. Pet. Cr. Ex. 26. Ms.

Graves asserts that the firm's failure to pay the escalators put it into default with

the landlord, Old Bridge, and that notwithstanding Old Bridge's acceptance of

VFN as a tenant, Quinto & Wilks remains liable for the unpaid escalator portions

of the rent. Mr. Wilks testified that Old Bridge never demanded the escalators,

and accepted the rent without protest throughout the course of the Lease with

Quinto & Wilks. The Court accepts this testimony, noting that Mr. Wilks is also a

member of Old Bridge and is able to state its legal position on the escalators. The

Court concludes that Old Bridge was not a creditor of Quinto & Wilks as of the

date of the filing of the Involuntary Petition. There is no dispute that VFN is

paying the rent to Old Bridge, and that the VFN Lease is not in default.

(ii)     *The Burke & Herbert Debt.* Quinto & Wilks had a commercial loan with Burke &

Herbert Bank. Pet. Cr. Ex. 51. As of the bankruptcy filing, the principal balance

due on this loan was $76,243.51. Pet. Cr. Ex. 52. The loan history for this loan

shows that Quinto & Wilks paid the regularly scheduled monthly payments on

this loan, without exception, from its inception in July 2013 (the first payment

was due in August 2013), through September 2014. *Id.* There is only a single

example during this time frame where more than 40 days' interest was charged to

the loan (2/19/2014 – 42 days). *Id.*

11

(iii)   *The Firm's Debt to Ms. Graves.* The firm's debt to Ms. Graves, putting aside the

firm's claim of a setoff for its legal fees under Section 12 of the Employment

Agreement, was acknowledged by Quinto & Wilks to be due and owing in the

amount of $27,089.92. Pet. Cr. Ex. 31; Q&W Ex. 4 ($5,602.50 + $21,039.67 +

$447.75 = $27,089.92). Ms. Graves claims that she is owed more, asserting that

she is entitled to be paid 45% of amounts billed by other attorneys and paralegals

and 45% of any expenses (not just her own) on the files on which she worked.

Quinto & Wilks disputes that she is entitled to these additional amounts, but it

acknowledges that she is owed the amount of $27,089.92, subject to its claim of

an offset for legal fees under Section 12 of the Employment Agreement. The

matter is complicated by the fact that Quinto & Wilks tendered these amounts to

Ms. Graves on December 30, 2013. Pet Cr. Ex. 31; Q&W Ex. 4. Ms. Graves

rejected the tender of these amounts, because they were tendered "in full payment

and satisfaction of all compensation owed to [her] by Quinto & Wilks, P.C. for

work performed and time you billed" in the two larger matters (Silvas

Construction and Simmons), and Ms. Graves wanted to avoid giving rise to an

accord and satisfaction defense in the pending State court litigation.[5]

(iv)   *The Credit Card Debts.* The firm had five credit cards—American Express (****

23001), Bank of America (**** 5028), United Bank VISA (**** 4231), Marriott

Rewards (**** 2996), and SunTrust VISA (**** 1838). Q&W Exs. 29–33. The

Court finds, with respect to each credit card account, as follows:

---

[5] Ms. Graves claims that she is owed additional amounts for work not yet collected from the clients. It is clear, however, under the Employment Agreement that she is only entitled to payment upon payment by the clients. Ms. Graves also claims that she is entitled to an award of attorney's fees and costs under Section 12 of the Employment Agreement.

(I)     American Express (**** 23001)—this card had a balance of $9,527.16 as

of December 27, 2013. Q&W Ex. 29. Quinto & Wilks regularly paid the

minimum monthly payment on this account every month, through

December 2014, with the exception of a late charge in the amount of $37

for October 2014. *Id.* It had a balance as of $9,583.35 as of December 28,

2014. *Id.*

(II)    Bank of America (**** 5028)—this card had a balance of $11,192.96 as

of January 25, 2014. Q&W Ex. 30. Quinto & Wilks regularly paid the

minimum monthly payments on this account through December 2014,

with the exception of one late charge ($49) that was charged on the

October 25, 2014, statement. *Id.* It had a balance of $11,898.10 as of

December 25, 2014. *Id.*

(III)   United Bank VISA (**** 4231)—this card had a balance of $562.25 as of

January 17, 2014. Q&W Ex. 31. Quinto & Wilks regularly paid the

minimum monthly payments on this account through January 17, 2015,

with only one late fee of $15 on the November 17, 2014 statement. *Id.* It

had a balance of $61.22 as of January 18, 2015. *Id.*

(IV)    Marriott Rewards (**** 2996)—this card had a balance of $20,298.28 as

of January 6, 2014. Q&W Ex. 32. Quinto & Wilks regularly paid the

minimum monthly payments on this account through December 2014,

with the exception of a $39 late charge in August 2014, a second $39 late

charge in October 2014, and a third late charge in the amount of $45 in

November 2014. *Id.* It had a balance of $20,042.05 as of January 6, 2015.

13

(V)     SunTrust VISA (**** 1838)—this card had a balance of $10,528.22 as of

January 16, 2014. Q&W Ex. 33. Quinto & Wilks regularly paid the

minimum monthly payments on this account through December 2014,

with the exception of a late charge ($49) in June 2014, a late charge ($49)

in August 2014, a late charge ($49) in September 2014, and a late charge

($49) in October 2014. *Id.* The Court further finds that all of these late

charges were incurred for payments made within a week of the date that

the payment was due. *Id.* This account had a balance of $10,879.35 as of

January 16, 2015. *Id.*

In all, the Court finds that each of the five credit cards was regularly paid when

payments were contractually due. The late charges were incurred for failure to

pay the minimum monthly payments on time, but these charges were of a de

minimis nature, and all of the payments were made before the next monthly

payment became due.

(v)     *Zelnick & Erickson.* The Zelnick & Erickson firm represents Quinto & Wilks in

Ms. Graves' lawsuit in the Prince William County Circuit Court. Its invoices are

found at Pet. Cr. Ex. 22. The invoices show that Quinto & Wilks regularly paid

Zelnick & Erickson, without fail, from the inception of the representation in July

2013, through September 2014. The invoice for October 2014 shows a balance of

$3,120 carried over from the previous month's invoice, but Mr. Wilks testified

that he was of the understanding that he could not pay any of Quinto & Wilks'

bills while the involuntary bankruptcy was pending. In sum, Q&W Ex. 22 makes

plain that Quinto & Wilks regularly paid the Zelnick firm from the start of the

representation through the filing of this involuntary bankruptcy case.

### Conclusions of Law

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of

Reference of the U.S. District Court for this District entered August 15, 1984. This is a core

proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

Quinto & Wilks' Motion to Dismiss and Ms. Graves' Motion for the entry of an Order

for Relief are, in essence, two sides of the same issue—whether or not an Order for Relief should

be entered. Accordingly, the Court will address both Motions simultaneously. In its Motion to

Dismiss, Quinto & Wilks argues: (1) Ms. Graves is not an eligible petitioning creditor, because

her claim is the subject of a bona fide dispute as to liability and amount; (2) Ms. Graves filed the

Involuntary Petition in bad faith; and (3) Ms. Graves has failed in sustaining her burden of proof

to show that Quinto & Wilks was not paying its debts as they became due, as required by 11

U.S.C. § 303(h)(1). As more fully stated below, the Court agrees that Ms. Graves' claim is the

subject of a bona fide dispute as to liability or amount. The Court also agrees that Ms. Graves has

not met her burden to show that Quinto & Wilks was not paying its debts as they become due.

(The Court does not find that Ms. Graves filed the petition in bad faith.) Accordingly, the Court

will dismiss the Involuntary Petition.

### I.   Ms. Graves' Claim Is the Subject of a Bona Fide Dispute as to Liability or Amount.

Bankruptcy Code Section 303(b)(2) provides that an involuntary petition may be filed by

"fewer than 12 such holders," referring to Section 303(b)(1)'s requirement that the petitioning

creditors hold claims that are not "contingent as to liability or the subject of a bona fide dispute

as to liability or amount[.]" The phrase "as to liability or amount" was added to the statute as a

part of the 2005 BAPCPA Amendments to the Code. The burden of proof to show that the

petitioning creditors' claims are not subject to bona fide dispute rests with the petitioning

creditors. *In re Byrd*, 357 F.3d 433, 437 (4th Cir. 2004); *Atlas Mach. & Iron Works, Inc. v.*

*Bethlehem Steel Corp.*, 986 F.2d 709, 715 (4th Cir. 1993). The term "bona fide dispute" "clearly

entails some sort of meritorious, existing conflict." *Id.* A claim is subject to a bona fide dispute

when there is a "'genuine issue of a material fact that bears upon the debtor's liability or a

meritorious contention as to the applicability of the law to the facts.'" *In re Caucus Distribs.,*

*Inc.*, 106 B.R. 890, 917 (Bankr. E.D. Va. 1989) (quoting *In re Lough*, 57 B.R. 993, 997 (Bankr.

E.D. Mich. 1986)). "The role of the bankruptcy court is not to resolve the dispute, but merely to

identify its presence for the purpose of including or eliminating the creditor from the count of

petitioning creditors." *In re Caucus Distribs., Inc.*, 106 B.R. at 917. *See also In re Byrd*, 357 F.3d

at 437 ("The bankruptcy court need not resolve the merits of the bona fide dispute, but simply

determine whether one exists.") A counterclaim related to the subject matter of the petitioning

creditors' claims may be considered by the bankruptcy court in determining whether there is a

bona fide dispute as to the petitioning creditors' claims. *In re Green Hills Dev. Co., LLC*, 741

F.3d 651, 659 (5th Cir. 2014) ("[b]ankruptcy courts routinely consider the existence and

character of pending but unresolved litigation as evidence of a bona fide dispute"); *In re TPG*

*Troy, LLC*, 492 B.R. 150, 159 (Bankr. S.D.N.Y. 2013) ("Pending litigation over a claim strongly

suggests, but does not establish, the existence of a bona fide dispute.")

Ms. Graves asserts that Quinto & Wilks has acknowledged owing her an amount in

excess of the statutory requirement of $15,325 under Bankruptcy Code Section 303(b)(2). She

argues that the rest of the dispute does not matter, because she inarguably has met the statutory

threshold of $15,325. Her position is supported by case law to the effect that once it is

16

acknowledged that the putative debtor owes more than the statutory threshold, any dispute as to

remaining amounts is irrelevant. *In re Roselli*, No. 12–32461, 2013 WL 828304, at *9 (Bankr.

W.D.N.C. Mar. 6, 2013); *In re Tucker*, No. 5:09–bk–914, 2010 WL 4823917, at *6 (Bankr. N.D.

W.Va. Nov. 22, 2010) ("[t]he better reasoned authority suggests that a petitioning creditor is not

disqualified even if a bona fide dispute exists regarding a *portion* of its claim") (emphasis in

original). Quinto & Wilks, on the other hand, argues that *any* dispute as to the amount of Ms.

Graves' claim means that Ms. Graves' debt is in bona fide dispute "as to amount" as now

provided under Section 303(b). *See Farmers & Merchs. State Bank v. Turner*, 518 B.R. 642, 652

(N.D. Fla. 2014) ("[a]fter the amendment adding 'liability or amount,' the majority of courts that

have addressed the issue, or commented on it, have concluded that the 2005 amendment changed

the analysis such that now *any* dispute as to amount (whether implicating the statutory threshold

or not) renders a creditor ineligible"); *In re Rosenberg*, 414 B.R. 826, 846 (Bankr. S.D. Fla.

2009) ("As a result of the [2005] amendment, any dispute regarding the amount of the

petitioning creditors' claims that arises from the same transaction and is part of the underlying

claim renders the claim subject to a *bona fide* dispute.") *See* Dean and Ehrenpreis, "Courts

Reverse Trend on Interpretation of 303(b)(1)," ABI Journal, Vol. XXXIII, No. 10 (October

2014) (comparing the "all or nothing" approach with the "partially disputed" approach).

The Court need not weigh in on the legal issue, however, because in this case Ms.

Graves' entire claim is the subject of a bona fide dispute. Ms. Graves argues that Quinto & Wilks

has acknowledged owing her at least $27,089.92. Quinto & Wilks, while acknowledging that

amount to be owing in the absence of a setoff for legal fees, claims that it is entitled to an award

of its attorney's fees and costs in the State court litigation, pursuant to Section 12 of the

Employment Agreement. Ms. Graves counters by arguing that Section 12 permits an award of

attorney's fees and costs only "to the non-breaching party . . . relating to an action to enforce the

terms of the Agreement, upon the conclusion that he or she is successful in enforcing the

Agreement." Pet. Cr. Ex. 1 at ¶ 12. The issue of whether Quinto & Wilks ultimately will be

entitled to an award of attorney's fees and costs in the State court action is a matter for

determination by the State court.

The Court might be inclined to agree with Ms. Graves' position that Section 12 of the

Agreement does not permit an award of attorney's fees to Quinto & Wilks, which has not

brought an action to enforce the agreement. Many courts have held that, where an agreement

provides only for an award of fees to an enforcing party, a party defending an action is not

entitled to an award of fees. *See Meltzer/Austin Rest. Corp. v. Benihana Nat. Corp.*, No. A–11–

CV–542–AWA, 2014 WL 7157110, at *4 (W.D. Tex. Dec. 15, 2014) ("In this context,

'enforcement' means proactive steps taken to ensure that Meltzer complied with its obligations

under the Agreement. It does not mean Benihana's defense of Meltzer's suit related to the

Agreement"); *Gadsby v. Am. Golf Corp. of Cal.*, No. 2:10–cv–680–FtM–38CM, 2014 WL

5473555, at *8 (M.D. Fla. Oct. 28, 2014) ("[a]pplying the plain meaning of 'enforce,' the

Bylaws, as written, do not clearly and unambiguously provide for entitlement to attorneys' fees

where, as here, the Club is required to *defend* against another party's attempt to enforce the

Bylaws against the Club"); *Hous. Auth. of Champaign Cnty. v. Lyles*, 918 N.E.2d 1276, 1279–80

(Ill. App. Ct. 2009); *Carr v. Enoch Smith Co.*, 781 P.2d 1292, 1296 (Utah Ct. App. 1989).

However, the Virginia Supreme Court recently upheld an award of attorney's fees to a defending

party in similar circumstances in an Unpublished Order. *DeCesare v. Godoy* (Case No. 141089,

April 10, 2015) (http://www.courts.state.va.us/courts/scv/orders_unpublished/141089.pdf) (last

visited May 27, 2015).

In the *DeCesare* case, the parties' Shareholder Agreement provided for an award of fees:

> In the event a party to this Agreement engages an attorney to enforce the provisions hereof or to secure performance by a defaulting party under the terms herein stated, the prevailing party in litigation arising therefrom shall be entitled to an award of its reasonable attorney's fees both on trial and the appellate level incurred in enforcing this Agreement and/or securing the performance of the terms herein stated.

*Id.* Four Justices, reviewing the Circuit Court's decision to award fees and costs to the defending party *de novo*, upheld the attorney's fee award. Three Justices dissented ("Dodging a blow, after all, is not the same thing as delivering one.") Although an Unpublished Order is only binding on the parties and does not constitute binding precedent, the Court views the Order in *DeCesare* to be a good indication of how the Virginia Supreme Court might rule on this issue.

This Court finds that Quinto & Wilks' claim for attorney's fees is based on a non-frivolous reading of Section 12 of the Employment Agreement, one that this Court cannot conclude has a zero chance of success in the State court in light of the Virginia Supreme Court's Unpublished Order in *DeCesare*. Quinto & Wilks clearly has made the claim for an award of attorney's fees and costs in its Answer. Q&W Ex. 8 at 5–6.

Ms. Graves further claims that Quinto & Wilks' responses to her Requests for Admissions in the State court action will estop Quinto & Wilks from claiming that she is owed anything less than $27,089.92. Pet. Cr. Exs. 3, 4. Quinto & Wilks' admissions in the State court litigation admit that these amounts are undisputed, but they do not admit that Quinto & Wilks has no offsetting claim for attorney's fees and costs. The issue of any offsetting claim for attorney's fees was not addressed in any of the Requests for Admission. Further, to the extent that these admissions could be construed in the way that Ms. Graves reads them, they can always be amended by an order of the State court. *See* Va. Sup. Ct. R. 4:11(b) ("the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved

thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits.") The potential for an award of attorney's fees and costs in favor of Quinto & Wilks, which would entirely offset the firm's liability if granted, leads the Court to conclude that Ms. Graves' claim is the subject of a bona fide dispute.

## II.    Ms. Graves Did Not File the Petition in Bad Faith.

Quinto & Wilks argues that, in addition to determining damages in the event of a dismissal under Section 303(i)(2) of the Code, the Court must assess the good faith, or the lack thereof, of the petitioning creditor in filing the involuntary petition in the first place. The Fourth Circuit has held that an involuntary petition may be dismissed on bad faith grounds. *Atlas Mach. & Iron Works, Inc.*, 986 F.2d at 716. Other courts have held that a good faith component is implicit in the filing of an involuntary petition. *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768, 785 (E.D. Pa. 2014) ("[i]nvoluntary and voluntary bankruptcy petitions—whether seeking Chapter 11 reorganization, Chapter 7 or Chapter 13—are subject to dismissal if filed in bad faith"); *In re Global Ship Sys., LLC*, 391 B.R. 193, 202–03 (Bankr. S.D. Ga. 2007). In order to dismiss a petition on bad faith grounds, the Court must examine "whether a reasonable person would have filed the petition (objective test) as well as the motivations of the petitioner (subjective test)." *Atlas Mach. & Iron Works, Inc.*, 986 F.2d 716. It is the putative debtor's burden to show that a petition was filed in bad faith. *Id.* at 716 n.9; *In re Caucus Distribs., Inc.*, 106 B.R. at 923.

Quinto & Wilks argues that Ms. Graves is guilty of bad faith because she is "forum shopping." In support of this argument, Quinto & Wilks asserts that Ms. Graves suffered a string of losses in the State court, including the denial of her motion to compel the production of

documents that were off-site, and the disqualification of her husband from acting as her counsel

in the lawsuit (noting that her husband is now representing her in this Court). But things did not

always go against Ms. Graves in the State court. The State court sustained her Demurrer to

Quinto & Wilks's counterclaim against her, albeit with leave to replead, whereupon Quinto &

Wilks non-suited its counterclaim. The State court overruled Quinto & Wilks' Demurrer to Ms.

Graves' complaint. The results in the discovery battles were fairly even, with Ms. Graves

winning on some issues and losing on others. Her husband was disqualified, but the matter was

never set for a trial, so she had plenty of time to replace him as her counsel, had she chosen to

engage new counsel.[6]

      The Court further does not ascribe any bad faith motives on Ms. Graves' part arising out

of the timing of the filing of the involuntary petition relative to Mr. Zelnick's Motion for the

entry of the Decree of Reference. Ms. Graves had a legitimate disagreement with the terms of the

proposed Decree (though, she could have communicated her concerns to Mr. Zelnick). It was not

entirely clear from the transcript that Judge Finch intended to appoint a Commissioner in

Chancery to report to the Court on "whether the Court should order an accounting as prayed for

by the plaintiff," Q&W Ex. 15 (proposed Order of Reference), or whether the Commissioner was

expected to conduct the accounting and report back to the Court with the results. This case can

be contrasted profitably with that of *In re Merrifield Town Center Limited Partnership*, No. 09–

18119–SSM, 2010 WL 5015006 (Bankr. E.D. Va. Dec. 3, 2010), where the creditors filed an

involuntary petition solely in order to avoid a dismissal of their cases in federal court for

discovery violations. *See id.* at *5 ("This is a case, in short, in which an involuntary petition was

---

[6] Quinto & Wilks argues that Ms. Graves sought discovery in this proceeding of the very same documents for which her Motion to Compel was denied by the State court judge. This Court never heard any discovery disputes in this matter, so the Court assumes either that Quinto & Wilks produced the documents without objection, or that it objected and Ms. Graves abandoned her efforts to secure the documents.

filed, not merely improvidently, but affirmatively for an improper purpose, namely, derailing the

trial in another court.") In this case, the State court action between Ms. Graves and Quinto &

Wilks was not set for a trial, the Order of Reference to the Commissioner in Chancery had not

yet been entered, and Ms. Graves' case was not on the verge of being dismissed for discovery

violations as were the petitioning creditors' claims in the *Merrifield Town Center* case.

In considering the allegations of bad faith, it has to be remembered that: (a) Quinto &

Wilks admitted in the State court to owing Ms. Graves more than the statutory threshold for an

involuntary filing of $15,325 (putting aside its offsetting claim for attorney's fees); (b) there was

a good faith basis for Ms. Graves to argue that the undisputed portion of her claim exceeded the

statutory threshold of Section 303(b); (c) Quinto & Wilks has acknowledged that it had less than

12 creditors as of the filing date; and (d) the firm's operating account had only $15,662.90 as of

September 30, 2014 (there was no way that Ms. Graves could have known that the operating

account would be back up to $52,690.66 by the end of October 2014). Prior to filing the

involuntary petition, Ms. Graves had formed the reasonable belief that there was very little, if

anything, being generated in new revenue by the firm, the firm was paying Burke & Herbert on a

monthly basis, and there was only $15,662.90 in the bank. There is no suggestion that Ms.

Graves filed the involuntary petition in an effort to put a competitor out of business (she is a

litigator; Mr. Wilks is an estate planning and business attorney), nor is there any evidence to

support the conclusion that she filed the involuntary petition out of spite, ill will or

maliciousness. The involuntary filing in this case can be said to be within the recognized purpose

of protecting against "'the threatened depletion of assets or to prevent the unequal treatment of

similarly situated creditors.'" *In re Meltzer*, 516 B.R. 504, 514 (Bankr. N.D. Ill. 2014) (quoting

*In re Letourneau*, 422 B.R. 132, 138 (Bankr. N.D. Ill. 2010)).

The Court finds that Ms. Wilks did not file the involuntary petition in bad faith.

### III.    Ms. Graves Has Failed to Prove that Quinto & Wilks Generally Was Not Paying Its Debts as They Became Due at the Time of the Involuntary Petition.

Bankruptcy Code Section 303(h)(1) requires a finding that the debtor "is generally not paying such debtor's debts as such debts become due[.]" The burden is on the petitioning creditor to show that the debtor is not generally paying such debts as they become due. *In re Caucus Distribs., Inc.*, 106 B.R. at 918. This Court has formulated the inquiry as to whether a debtor is generally paying its debts as they become due as follows:

> Generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments that are significant in amount in size to the debtor's operation. Where the debtor has few creditors, the number which will be significant will be fewer than when the debtor has a large number of creditors. Also the amount of debts being paid is important. If the amounts missed are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper. Determining that a debtor is generally not paying his debts requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts. A court must compare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of the nonpayment, and the nature of the debtor's conduct of its financial affairs. A starting point in the inquiry is to employ what is termed the mechanical test which is composed of five factors: the timeliness of payments on past due obligations; the amount of debts long overdue; the length of time during which the debtor has been unable to meet large debts; any reduction in the debtor's assets, and the debtor's financial situation.

*In re Caucus Distribs., Inc.*, 83 B.R. 921, 931 (Bankr. E.D. Va. 1988) (citations and quotation marks omitted). "In the final analysis, the determination whether an alleged debtor is generally not paying his or her debts as they become due is a flexible one which admits 'no hard and fast rules,' and requires a careful balancing of both the number and amount of the unpaid debts, in proportional terms, viewed in the light of the alleged debtor's total financial picture." *In re Fischer*, 202 B.R. 341, 350 (E.D. N.Y. 1996) (quoting *In re Einhorn*, 59 B.R. 179, 185 (Bankr.

E.D.N.Y. 1986)). The *Fischer* court identified the following factors to be considered: (1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the nonpayments; and (4) the debtor's overall conduct of its financial affairs. *In re Fischer*, 202 B.R. at 350 (citing *In re Caucus Distribs., Inc.*, 83 B.R. at 931).

Other than Ms. Graves' claim, Quinto & Wilks had debts owing to the following creditors as of the date of the involuntary petition: (a) Burke & Herbert Bank; (b) the five credit card obligations; and (c) Zelnick & Erickson. The firm was completely current with Burke & Herbert Bank, with no evidence of a default. The firm paid the credit cards faithfully according to their terms, with only a few late charges, and even where late charges were incurred, the payments generally were made within four or five days of the payment due date. As well, the firm was completely current and not in default with Zelnick & Erickson, until the date that the involuntary petition was filed (at which point, Mr. Wilks understood that he could not pay any of the firm's debts, and did not make the payment due in October 2014 of $3,120). In terms of the aggregate number of debts, the Court finds that the firm was current and was not in default on all of its obligations during the year preceding the filing of the involuntary bankruptcy case, with the exception of the amounts due to Ms. Graves. The firm did tender the amounts that it thought that it owed to Ms. Graves in December 2013 (Pet. Cr. Ex. 31; Q&W Ex. 4), though with "in full payment and satisfaction" language which was not acceptable to Ms. Graves. The firm never missed payroll. It had no withholding taxes due at the time of the involuntary petition. It never missed a payment to its landlord (in fact, it was no longer obligated on its Lease as of the involuntary filing). It had no pending legal malpractice cases against it at the time of the involuntary filing. It had no judgments against it.

With respect to the amount of the claims, the Court further finds that, with the exception of Ms. Graves' claim, Quinto & Wilks was regularly paying its debts as they became due during the year preceding the bankruptcy case. Again, the firm was current with Burke & Herbert. The firm incurred late charges on its credit cards, but these were not significant and the payments were made within four or five days of their due date. The firm paid Zelnick & Erickson like clockwork, until the involuntary bankruptcy was filed. The Court finds that the late charges on the credit cards were not material to the Debtor's overall financial condition.

The Court also must view the putative Debtor's overall conduct of its financial affairs. By and large, the firm conducted its financial affairs in a responsible manner as it wound down its financial affairs. There has been no effort to evade financial responsibility on any of its debts— perhaps not surprisingly, since Mr. Wilks is a personal guarantor on many of the corporate obligations. The firm has been attempting to close out the estates that it still has open, but claims that it has been prevented from doing so by Ms. Graves' assertion of direct claims to legal fees allegedly owed by the estates (as opposed to being owed to her employer, with whom the estates contracted for legal services). The firm attempted to tender what they thought they owed Ms. Graves at the end of December 2013 (Pet. Cr. Ex. 31; Q&W Ex. 4), though Ms. Graves rejected the tender of these funds in order to avoid giving rise to an accord and satisfaction defense in her litigation against the firm. In fact, Ms. Graves acknowledged in her testimony that, other than her own claim, she was not aware of anyone else not being paid on a regular basis, prior to the bankruptcy filing.

Finally, Ms. Graves claims that: (a) Quinto & Wilks paid a total of $42,510.50 to VFN in May 2013, in what appears to be in exchange for Mr. Wilks' stock in VFN (Pet. Cr. Ex. 23); and (b) the Quinto & Wilks furniture and artwork were distributed to Mr. Wilks, who contributed

them to VFN for his stock in VFN. Mr. Wilks testified, however, that all of these terms were part of an agreement between VFN and Quinto & Wilks, under which Quinto & Wilks received value, notably: (a) Quinto & Wilks would retain its accounts receivable; (b) Quinto & Wilks was relieved of its obligations on the Old Bridge Lease because VFN entered into a new Lease with Old Bridge (except for the first 45 days); and (c) notwithstanding the VFN-Old Bridge Lease, Quinto & Wilks would retain the KV Acquisitions Sublease rent (in the amount of $1,675 per month) for so long as it was winding down its affairs. The Court concludes that the payments to VFN were part of a bargained-for exchange, and do not appear to have been fraudulent in nature (and in any event, Ms. Graves retains whatever rights she may have as a putative creditor of the firm).

The Court finds that Ms. Graves has not met her burden to show that the firm was not generally paying its debts as they became due.

## Conclusion

For the foregoing reasons, the Court will issue a separate Order, under which the Involuntary Petition will be dismissed.

Date: _____   /s/ Brian F. Kenney
          May 29 2015           _____
                                Brian F. Kenney
Alexandria, Virginia            United States Bankruptcy Judge

Entered on Docket: May 29 2015

26

Copies to:

Quinto & Wilks, P.C.
3441 Commission Court
Suite 104
Woodbridge, VA 22192
*Chapter 7 Debtor*

Kevin M. O'Donnell, Esquire
Henry & O'Donnell, P.C.
300 N. Washington Street
Suite 204
Alexandria, VA 22314
*Counsel for Chapter 7 Debtor*

Jenine E. Graves
11961 Beaver Mill Ln.
Manassas, VA 20112
*Petitioning Creditor*

Timothy Wayne Graves, Esquire
A Attorney LLC
9300 Grant Ave Suite 203
Manassas, VA 20110
*Counsel for Petitioning Creditor*